# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-1955

_____

United States of America

*Plaintiff - Appellee*

v.

Johntez Randle

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: April 11, 2016
Filed: July 27, 2016
[Unpublished]

_____

Before LOKEN, BEAM, and SMITH, Circuit Judges.

_____

PER CURIAM.

Johntez Randle appeals his sentence, following a guilty plea, for conspiracy to deal in counterfeit currency, and aiding and abetting uttering counterfeit obligations.

Randle argues the district court[1] erred in calculating the amount of loss and by assessing him an enhancement for being a manager or leader in the conspiracy.

Officials first became aware of Randle and the counterfeit conspiracy in August 2012 during a traffic stop of Randle's vehicle. Counterfeit bills were found in Randle's and the driver's possession. During the entirety of 2013 and continuing until issuance of the indictment in May 2014, Randle and others associated with him, attempted to, and did, pass counterfeit bills at numerous fast food and retail locations primarily in Minnesota. Randle and six others were charged in a nine-count indictment with conspiracy to deal in counterfeit currency, uttering counterfeit obligations, and aiding and abetting uttering counterfeit obligations, in violation of 18 U.S.C. §§ 2, 371, 472, and 473. Randle pleaded guilty to Counts 1 (conspiracy) and 3 (aiding and abetting).

The case agent for the counterfeit investigation, United States Secret Service Special Agent Steven Amelse, testified at Randle's sentencing hearing. Amelse testified that he interviewed Randle's six co-conspirators,[2] and all indicated that the source of counterfeit money was Randle. Indeed, several members of the conspiracy told Amelse that Randle kept the information on how to make the counterfeit notes to himself. Through surveillance, law enforcement determined that Randle used simple resume paper to make sheets of counterfeit bills, and then Randle used an X-ACTO knife (found during a search incident to arrest) to cut the sheets into individual bills. The co-conspirators testified that Randle provided them with counterfeit bills, and it was their role to purchase items with the bills, exchange the items for cash, and then return the cash to Randle. Randle gave them a portion of the proceeds for their

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]While only seven co-conspirators were indicted in the instant case, Amelse indicated that approximately twenty people were involved in the conspiracy.

efforts. One co-conspirator testified that Randle instructed him to leave the counterfeit bill and flee the retail establishment if a cashier detected the fraud or became suspicious.

One of the two disputes in this sentencing appeal is the amount of loss properly attributed to Randle. Amelse explained how the government arrived at its loss calculation. Amelse compiled a spreadsheet of serial numbers on counterfeit bills known to have been passed by Randle or a member of the conspiracy, either by way of video surveillance from the retail location, or through police reports of counterfeit bills seized from a member of the conspiracy. The amount attributable to the conspiracy from these direct sources totaled approximately $16,000. However, whenever counterfeit bills are discovered in interstate commerce, they are sent to a centralized tracking system known as the Field Investigative Reporting System (FIRS). Through FIRS, the Secret Service documents each counterfeit bill's serial number, its denomination, the date it was sent to FIRS, and the city where it was passed or discovered. In addition to the $16,000 loss amount discovered through direct surveillance and seizure, Amelse also received, via FIRS, counterfeit bills with serial numbers identical to those used in Randle's counterfeit conspiracy. When the FIRS totals were added, the government contended that the loss attributable to the conspiracy amounted to more than $85,000. These loss amounts, the various serial numbers used in the conspiracy and the locations where the bills were passed were all detailed in Amelse's spreadsheet, Government's Exhibit l, which was explicated at the sentencing hearing.

In addition to the loss amount, Randle also objected at sentencing to the district court's assessment of his role in the offense. Randle was assessed a three-level enhancement for being a manager or leader in the conspiracy. The district court made this determination based upon testimony from Amelse detailing how Randle produced the counterfeit bills, sold them, and recruited others to pass them and return proceeds to him. After hearing testimony and arguments on Randle's objections to loss amount

and his role in the offense, the district court agreed with the government that the loss amount was in excess of $85,000, that Randle was a manager or leader in the conspiracy, and sentenced him to 51 months, the bottom of his Guidelines range. The district court did so after giving Randle the benefit of a proposed change to the Guidelines loss tables that was due to take effect, but was not yet operative. Randle appeals, arguing that the loss amount should have been $16,000, and that he was not a manager or leader.

We review the district court's factual findings, including its determination of the amount of loss and a defendant's role in the offense, for clear error, and its application of the Guidelines to the facts de novo. United States v. Hawkins, 796 F.3d 843, 871, 872 (8th Cir. 2015), cert. denied sub nom. United States v. Heurung, No. 15-8968, 2016 WL 2945304 (May 23, 2016). It is the government's burden to prove amount of loss, but the district court need only make a reasonable estimate of that loss. United States v. Markert, 774 F.3d 922, 925 (8th Cir. 2014). The evidentiary standard for sentence-enhancing fact-finding in this particular case is by a preponderance of the evidence. United States v. Beckman, 787 F.3d 466, 494 (8th Cir.), cert. denied, 136 S. Ct. 160 (2015).

Randle challenges the amount of loss, arguing that any amounts over $16,000 are too speculative to be included in the loss total. We disagree. Amelse carefully explained that counterfeit bill amounts were only added to Exhibit 1 if the bill contained a serial number known to have been used in the conspiracy. This was not using "extrapolation" to arrive at the amount of loss as contended by Randle. Instead it was a reasonable method to measure the scope of a conspiracy; a task that can be difficult because not all counterfeit bills are immediately discovered as fake by either merchants or authorities. While it is theoretically possible that another counterfeiter coincidentally used the same serial numbers as the ones used in Randle's conspiracy, it seems both speculative and unlikely, and certainly does not push the needle back to less than a preponderance of the evidence. Cf. United States v. Hodge, 588 F.3d

970, 974 n.4 (8th Cir. 2009) (noting it was "unlikely" that someone with a "grudge" had hacked into the defendant's computer and submitted false claims on her behalf).

Nor did the district court err in assessing Randle a role enhancement. Randle adduced testimony at the sentencing hearing to the effect that there were several members of the conspiracy who provided counterfeit bills, directed the actions of others, and perhaps also produced counterfeit bills. Nonetheless, there was also testimony that Randle performed these actions. Randle need not be the only manager or leader to be assessed the role enhancement. United States v. Irlmeier, 750 F.3d 759, 764 (8th Cir. 2014). The key factors are control and organization, id., and the evidence at sentencing indicated by a preponderance of the evidence that Randle exerted both. The district court did not err in assessing the three-level enhancement for Randle's role in the offense.

We affirm the district court.

_____